# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00403-CR

**Roy Garcia, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF HAYS COUNTY, 428TH JUDICIAL DISTRICT
### NO. CR-10-0625, HONORABLE WILLIAM HENRY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Roy Garcia of the offenses of assault family violence, strangulation, and assault family violence, repeat offender. *See* Tex. Penal Code Ann. § 22.01(b)(2)(A), (B) (West 2011). Punishment was assessed at twenty years' imprisonment and a $5,000 fine for the strangulation offense and ten years' imprisonment and a $5,000 fine for the repeat-offender offense, with the sentences to run concurrently. In five issues on appeal, Garcia asserts that: (1) there is insufficient evidence to satisfy the element of the repeat-offender offense requiring proof of a prior conviction involving family violence; (2) the district court abused its discretion in admitting extraneous-offense evidence; (3) the district court erred in admitting the victim's out-of-court statements in violation of Garcia's right of confrontation; (4) the district court abused its discretion in admitting the victim's out-of-court statements to a police officer under the "excited utterance" exception to the hearsay rule; and (5) the district court abused its discretion in

admitting the victim's out-of-court statements to a doctor under the "medical diagnosis or treatment" exception to the hearsay rule. We will affirm the judgments of conviction.

**BACKGROUND**

The jury heard evidence that on or about June 5, 2010, Garcia assaulted his girlfriend or common-law wife, Lily Cooper. Despite being subpoenaed to testify, Cooper did not appear at trial. Instead, evidence of the assault was presented through the testimony of the officers who had investigated the case, the doctor who had treated Cooper following the assault, and Cooper's mother.

The victim's mother, Christina Cooper, testified that her daughter and Garcia had been dating for approximately four years prior to trial and that they were living together at the time of the alleged assault. Christina testified that on the night when the assault allegedly occurred, she called Garcia's residence and asked to speak with her daughter. Christina recalled that when she talked to her daughter, she sounded "upset," "was crying," and "was trying to control her voice but it was quavering a bit." Christina "had the impression that things might not be going well and, based on past experience," she "was afraid that [Cooper] might be in trouble again." Christina decided to drive to Garcia's residence to see if her daughter needed help. When Christina arrived, no one was home, and she left.

The next morning, Christina returned to the residence to make sure that her daughter "was all right." When Christina saw her daughter, she noticed that her lower lip was "swollen and scraped," and she was wearing her bathrobe "up to her chin" and "holding it closed." Christina testified that her daughter refused to talk to her about what had happened, became angry, and eventually told her mother to leave. Christina did so.

2

That night, Christina testified, her daughter called her and requested that she come to an H.E.B. in San Marcos and pick her up. According to Christina, her daughter sounded "terrified." She explained, "[H]er voice was quavering. She was hysterical. She was having a hard time communicating what she was wanting to communicate, speaking quickly. Her voice was shaky and she was crying." Christina testified that when she arrived at the H.E.B., her daughter "ran out to meet [her]." That night, Christina took her daughter to the hospital. When asked why she took her daughter to the hospital, Christina testified, "Because she was injured. Because I frankly had given her a choice of calling the police, taking her to the woman's shelter or taking her to the emergency room." According to Christina, her daughter "chose the ER."

Dr. Joseph Berro, an emergency-room physician at Central Texas Medical Center, testified that Cooper checked in as a patient to the emergency room on June 6, 2010. According to Berro, Cooper's chief complaint was "physical abuse and assault." Berro explained that he began "trying to find out what exactly happened to her, what caused her injuries, what injuries she might have." When asked what Cooper had told him regarding what had happened to her, Berro testified,

> She told me that she was assaulted by her boyfriend. She said that she was tied up by her wrists, that she was choked, hit several times with the fists. A plastic bottle was shoved in her mouth. She was shoved against the wall and was complaining of some pain to the back of her head and that she had a knee shoved into her chest and that she was put in the closet for two hours.

Berro proceeded to examine Cooper's body for signs of injury. He observed "no visible injury to the mouth itself," but did observe "linear abrasions just over the left wrist" that had been caused, according to what Cooper had told Berro, by "being tied up." Berro also testified that Cooper had told him that the back of her head hurt because "she was pushed against the wall and

3

struck the back of her head"; that "she was complaining of pain in her chest" as a result of "a knee being put into her chest"; and that she had neck pain because "she had been choked."

Berro then performed a full physical exam on Cooper. He noticed that she had bruising over the side of her neck, bruises on her arms, a red mark over her left wrist, and a bruise and tenderness on her lower back. Berro testified that Cooper's injuries were consistent with the history that she had provided. According to Berro, Cooper was "very upset, tearful and anxious" during the examination, and he agreed with the prosecutor that Cooper was "definitely under the stress of the event that had happened to her."

Officer Dustin Slaughter of the San Marcos Police Department was dispatched to the hospital to investigate the reported assault. When Officer Slaughter entered Cooper's room and began examining her, he observed "bruising up and down both arms," "what appeared to be a rope burn on [Cooper's] left forearm," "abrasions around her back," "some red marks around her throat," and "an abrasion probably about the size of a dime in the roof of her mouth." Slaughter believed the bruises were "very, very recent." Slaughter took photographs of Cooper's injuries, which were admitted into evidence.

As Slaughter attempted to interview Cooper about what had happened to her, he observed that she was "very embarrassed, afraid, fearful, timid." He added that "she would not make eye contact" and was "somewhat reluctant" to talk to him. Slaughter testified that he believed the reason for her reluctance was because "she was very scared" and "very, very afraid of what was going to happen." Slaughter also observed that Cooper was crying to such a degree that she had "tears running down her face" and was "not able to speak where [Slaughter] could understand her." According to Slaughter, Cooper appeared "somewhat excited" but "more scared than excited," and

4

"she had to stop and catch her breath to be able to talk before [Slaughter] could understand what she was saying." Slaughter agreed with the prosecutor's characterization of Cooper as "having difficulty controlling her emotions about the event" and as being "still under the stress of the incident." Slaughter explained,

> It took a while to get the information out of her because, again, she—she was having a real hard time talking about it. She would start to cry. She was—she was in a great deal of pain. She said that several times. But she did have quite a bit of information.

Slaughter then proceeded to testify as to what Cooper had told him regarding the assault. According to Slaughter, on the day of the assault, Garcia and Cooper had gotten into an argument while they were "floating the river" and "consuming alcoholic beverages" in New Braunfels. Cooper took their car and drove back to San Marcos by herself, leaving Garcia behind in New Braunfels to walk home. When he returned home that night, Slaughter testified, Garcia began "throwing [Cooper] around the [bed]room." Garcia then "took a climbing rope," "bound her hands together," and eventually "also bound her feet." Cooper "then started screaming for help," which prompted Garcia to repeatedly "stuff[] a rag in her mouth." Slaughter testified that Cooper further told him that Garcia was "very aggressive, very angry," and "made comments . . . that she had better not tell anyone about what he was doing or she would be sorry." According to what Cooper had told Slaughter, Garcia also "placed a knee on her chest," alternated between placing his hands over her mouth and around her throat, explained to her the difference between "suffocation and strangulation," and repeatedly shoved a plastic water bottle "so far in her mouth that she started gagging." Finally, Slaughter testified, while Cooper's hands and feet were still bound by the rope, and after what Cooper had estimated to be approximately one hour after the assault began, Garcia

5

"put her in the closet [and] left her there for an unknown amount of time," until her mother called. Based on his interview with Cooper, Slaughter prepared a written report, completed a domestic-violence supplemental form, and forwarded his report to the criminal-investigations division of the police department for further action.

San Marcos Police Detective Sandra Spriegel, who specializes in crimes against persons, including family-violence assaults, also investigated the case. Spriegel testified that she spoke with Cooper on June 18, 2010, and that Cooper had provided a written statement of what had occurred.[1] According to Spriegel, Cooper was still "very scared" of Garcia at the time Spriegel interviewed her. Following this interview, Spriegel obtained an arrest warrant for Garcia. Spriegel also testified that during her investigation, she learned that Garcia had a "prior conviction for assault."

Cooper's mother, Christina, provided more detailed testimony regarding this prior assault, which formed the basis for the element of the repeat-offender charge requiring a prior conviction. According to Christina, in the summer of 2009, Garcia was arrested for assaulting Cooper in Guadalupe County. Christina testified that she was present when the police were conducting their investigation and placing Garcia in handcuffs, so she "assumed that he was under arrest." Christina also testified that she was aware that charges had been filed against Garcia for assaulting Cooper, and that the bruises she had observed on her daughter were similar to the bruises that she had observed following the 2010 assault, specifically, "some swelling in her face and some bruising around her neck." Documents relating to the prior offense were admitted into evidence,

---

[1] The State offered the written statement into evidence, but the district court sustained Garcia's hearsay and confrontation objections to the statement.

including the indictment, plea agreement, and judgment of conviction. Some of the documents contained what the State purported to be Garcia's signature and initials, and Christina testified that she recognized the signature and initials on the documents as belonging to Garcia.

The jury found Garcia guilty of committing the assault offenses as charged.[2] Punishment was assessed as noted above, and the district court sentenced Garcia accordingly. This appeal followed.

## ANALYSIS

### Sufficiency of evidence relating to prior conviction

In his first issue, Garcia asserts that the evidence is insufficient to prove his identity as the person who was convicted of the prior assault offense. According to Garcia, the only evidence linking him to the prior conviction was Christina's testimony in which she identified Garcia's signature and initials on the documents relating to the offense, and, in Garcia's view, this is not sufficient to prove that he was the person convicted of the offense.

To determine whether evidence is sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence,

---

[2] However, the jury found Garcia not guilty of committing the separately charged offense of aggravated kidnapping.

and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *Gear*, 340 S.W.3d at 746; *Brooks*, 323 S.W.3d at 899.

An essential element of the offense of assault family violence, repeat offender, is that the defendant has been previously convicted of a family-violence offense. *See* Tex. Penal Code Ann. § 22.01(b)(2)(A). To establish that a defendant has been convicted of a prior offense, the State must prove beyond a reasonable doubt that (1) a prior conviction exists, and (2) the defendant is linked to that conviction. *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007). Texas law does not require that the fact of a prior conviction be proven in any specific manner. *Id*. at 922. "Any type of evidence, documentary or testimonial, might suffice." *Id*. "Further, the State may use circumstantial evidence to prove the defendant is the same person named in the alleged prior convictions." *Orsag v. State*, 312 S.W.3d 105, 115 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd).

The court of criminal appeals has compared the proof required to establish a prior conviction to the pieces of a jigsaw puzzle:

> The trier of fact fits the pieces of the jigsaw puzzle together and weighs the credibility of each piece. Regardless of the type of evidentiary puzzle pieces the State offers to establish the existence of a prior conviction and its link to a specific defendant, the trier of fact determines if these pieces fit together sufficiently to complete the puzzle. The trier of fact looks at the totality of the evidence admitted to determine 1) whether there was a previous conviction, and 2) whether the defendant was the person convicted. If these two elements can be found beyond a reasonable doubt, then the various pieces used to complete the puzzle are necessarily legally sufficient to prove a prior conviction.

*Id*. at 923 (citing *Margraves v. State*, 34 S.W.3d 912, 918-19 (Tex. Crim. App. 2000); *Human v. State*, 749 S.W.2d 832, 835-36 (Tex. Crim. App. 1988) (op. on reh'g)). The evidence offered by

the State can include the testimony of a witness who personally knows the defendant and the fact of his prior conviction and identifies him; expert testimony matching the defendant's fingerprints to the fingerprints on the judgment; photographs of the convicted individual for comparison with the defendant; and identification information such as name, gender, height, eye color, hair color, and date of birth. *See id*. at 921-22; *Beck v. State*, 719 S.W.2d 205, 209 (Tex. Crim. App. 1986); *Littles v. State*, 726 S.W.2d 26, 31-32 (Tex. Crim. App. 1984) (op. on reh'g).

Here, the judgment of conviction was admitted into evidence, and it tended to show that on December 16, 2009, someone with the name Roy Garcia was convicted in Guadalupe County of an assault-family-violence offense. The written judgment also tended to show that this person pleaded guilty to the offense and was sentenced to 166 days in county jail. Attached to the judgment were other documents relating to the conviction, including the indictment describing the offense and the plea agreement.[3] The documents contained, in multiple locations, the signature and initials of a person the State purported to be Roy Garcia. Garcia asserts that the only evidence linking him to the prior conviction was the testimony of his mother-in-law, who testified as to her recognition of the signature and initials as follows:

> Q:     I'm going to show you what's been admitted as State's Exhibit 19 and ask if you have personal knowledge of this defendant's signature. Do you—have you seen it before?
>
> A:     Yes, I have.
>
> Q:     Okay. Do you see his signature anywhere on this page?
>
> A:     This appears to be his signature (indicating).

---

[3]  The documents all contained the same trial court cause number as the judgment of conviction, No. 09-1944-CR.

9

Q:     Is it consistent with what you've seen in the past?

A:     A little sloppier, but the R. is consistent.

Q:     Okay.  Well, I mean are you comfortable—

A:     I would accept it. I would accept it as his.

Q:     Okay. I just want to—you're comfortable saying that he signed this document.

A:     Yes.

After the district court overruled Garcia's objection to the fact that the witness was not a "handwriting expert," the testimony continued:

Q:     And I guess—well, can you look through this document and see if you recognize his signature in any other places?

A:     Here (indicating).

Q:     Okay.  And what page are you referring to?

A:     The second page.

Q:     Okay.

A:     There appear to be initials, yes, on each page.

Q:     And whose initials do you recognize?

A:     R.G.  R.G.

Q:     And the—

A:     The G. looks more like the signature I've seen before on the initials.

Q:     Okay. So you recognize those initials to be—

A:     Yes.

Q:     —this defendant's?

A:     Yes.

Garcia argues that the above lay-opinion testimony, without more, is insufficient to link him to the prior conviction. *See Cain v. State*, 468 S.W.2d 856, 859 (Tex. Crim. App. 1971) ("[W]here handwriting samples are introduced without expert testimony and the jury alone must make the comparison, and there is no other evidence to connect the appellant with the prior convictions, such identity has not been sufficiently established.").

Assuming without deciding that the holding in *Cain* is still good law and applicable to the facts before us,[4] we disagree with Garcia's contention that there was no evidence other than Garcia's purported signature and initials that linked him to the prior conviction. Additional evidence included the indictment describing the offense, which had the same cause number as the conviction, and which alleged that a Roy Garcia, on or about July 3, 2009, in Guadalupe County, caused bodily injury to Lily Cooper. Cooper's mother testified that she had personally observed the defendant being arrested for this offense in Guadalupe County in the summer of 2009, and she was aware that the arrest had resulted in charges being filed against Garcia. Also, the plea agreement included a judicial confession in which a Roy Garcia admitted to causing bodily injury to Lily Cooper on the date in question. From this and other evidence, the jury could have reasonably inferred that the Roy Garcia who was convicted of assaulting Lily Cooper in 2009 was the same Roy Garcia who

---

[4] We note that in *Cain*, unlike in this case, no witness, expert or otherwise, testified that she was familiar with and recognized the defendant's signature. *See Cain v. State*, 468 S.W.2d 856, 858-59 (Tex. Crim. App. 1971). We also observe that *Cain* was overruled in part in 1987 to the extent that it held that there are exclusive manners of linking a defendant to a prior conviction. *See Littles v. State*, 726 S.W.2d 26, 32 (Tex. Crim. App. 1987) (op. on reh'g).

was charged with assaulting Lily Cooper in 2010. Furthermore, Detective Spriegel testified that she had learned during her investigation that Garcia had a prior conviction for assault, and the jury could have reasonably inferred that the 2009 conviction was the conviction to which Spriegel was referring. Other evidence included jail visitation logs and jail correspondence which tend to show that the Roy Garcia who was convicted in 2009 of assault was visited by and attempted to communicate with Lily Cooper, the victim in the present case, while he was in jail. The jury could have reasonably inferred from this and other evidence that the defendant Roy Garcia was the same Roy Garcia who had been sentenced to 166 days in county jail for the 2009 assault conviction. Finally, the date of birth specified in the documents relating to the 2009 conviction was identical to the date of birth of the defendant specified on his booking report for the current offense. Viewing all of the evidence in its totality and in the light most favorable to the verdict, we conclude that the evidence is sufficient to prove that Garcia had a prior conviction for the offense of assault-family violence. We overrule Garcia's first issue.

**Admissibility of extraneous-offense evidence**

In his second issue, Garcia asserts that the district court abused its discretion in admitting extraneous-offense evidence, specifically, the evidence related to his prior conviction. He claims that the evidence had no probative value apart from impermissible character-conformity purposes and that it was more prejudicial than probative. *See* Tex. R. Evid. 403, 404(b). The State responds that the evidence was admissible for purposes other than proving character conformity and

12

that the probative value of the evidence was not substantially outweighed by the prejudicial effect of the evidence.[5]

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Ramos v. State*, 245 S.W.3d 410, 417-18 (Tex. Crim. App. 2008). A trial court abuses its discretion only when its decision "is so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)).

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. Tex. R. Evid. 404(b). It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id*. "The exceptions listed under Rule 404(b) are neither mutually exclusive nor collectively exhaustive." *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). "'Rule 404(b) is a rule of inclusion rather than exclusion.'" *Id*. (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)). "The rule excludes only that evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character." *Id*. (citing *Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996)). A trial court's ruling on extraneous offense evidence

---

[5] In addition to arguing the merits of this issue, the State asserts that Garcia did not object on the basis of Rules 403 or 404(b) at the time the evidence was admitted and thus failed to preserve error. *See* Tex. R. App. P. 33.1. However, in a hearing outside the presence of the jury, before the evidence was admitted, Garcia did object on these grounds, and the record reflects that the district court overruled both objections. That is sufficient to preserve error. *See Geuder v. State*, 115 S.W.3d 11, 15 (Tex. Crim. App. 2003); *see also* Tex. R. Evid. 103(a)(1) ("When the court hears objections to offered evidence out of the presence of the jury and rules that such evidence be admitted, such objections shall be deemed to apply to such evidence when it is admitted before the jury without the necessity of repeating those objections.").

is generally within the zone of reasonable disagreement "if the evidence shows that 1) an extraneous transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury." *Id*. at 344 (citing *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997)).

Rebuttal of a defensive theory is one of the permissible purposes for which extraneous-offense evidence may be admitted. *See Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003). Further, extraneous offenses are admissible to rebut defensive theories raised by the testimony of a defense witness during direct examination or a State's witness during cross-examination. *See Daggett v. State*, 187 S.W.3d 444, 453-54 (Tex. Crim. App. 2005); *Ransom v. State*, 920 S.W.2d 288, 301 (Tex. Crim. App. 1996). They are also admissible to rebut defensive theories such as fabrication that are raised by defense counsel during opening argument. *See Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008); *Powell v. State*, 63 S.W.3d 435, 438-40 (Tex. Crim. App. 2001).

In this case, the record reflects that a defensive theory throughout trial, beginning during counsel's opening argument, was that Cooper had fabricated the allegations against Garcia because she was a drug user at the time of the alleged assault and because Child Protective Services was threatening to take her children away from her.[6] Thus, it would not have been outside the zone

---

[6] During her opening statement, defense counsel argued the following:

> That night, Lily's mom takes her to the ER and this story begins. I told mom Roy beat me up. I don't have cocaine. What do I do now. Oh, my God, ER personnel called the cops. I can't change my story. Now CPS will get my children. And you know what? Here we are. . . . This is a snowball out of control. We got a girl with cocaine in her system making an allegation against the boyfriend because she's afraid

of reasonable disagreement for the district court to conclude that evidence that Garcia had assaulted Cooper on a prior occasion had a tendency to rebut that theory. *See Bass*, 270 S.W.3d at 563.

Nor would it have been outside the zone of reasonable disagreement for the district court to conclude that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. "The term 'probative value' refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). "'Unfair prejudice' refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id*. "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Williams v. State*, 958 S.W.2d 186, 196 (Tex. Crim. App. 1997). Evidence should be excluded under rule 403 only when there exists "a clear disparity between the degree of prejudice of the offered evidence and its probative value." *Jones v. State*, 944 S.W.2d 642, 653 (Tex. Crim. App. 1996).

Here, the district court could have reasonably found that the probative value of the evidence was high. First, the fact that Garcia had a prior conviction for assault-family violence was an essential element of the repeat-offender charge, and the district court would not have abused its discretion in concluding that the State needed the evidence for that purpose. But additionally, because the victim did not appear at trial to testify, the district court would not have abused its discretion in concluding that the State also needed the evidence to rebut the defensive theory of

of losing her kids and she can't get out of it. The cops get it. Then CPS gets it. Then the DA gets it. . . . It stops here. But not with that man guilty for something he didn't do.

15

fabrication, as the victim herself was unavailable to rebut the theory. At the same time, the district court could have reasonably concluded that there was not a "clear disparity" between the degree of prejudice of the offered evidence and its probative value. The victim's mother, when testifying to the extraneous offense, did not go into graphic detail regarding the circumstances surrounding the prior assault, and the documents relating to the offense also did not provide much detail in describing the assault.[7] Additionally, the district court could have reasonably found, presenting the testimony and documents relating to the prior assault would not consume an inordinate amount of time during the trial and did not have a tendency to confuse the jury, as the State made a clear distinction during trial between the prior assault that occurred in 2009 and the charged assault that occurred in 2010.

We cannot conclude on this record that the district court abused its discretion in admitting the extraneous-offense evidence. We overrule Garcia's second issue.

**Garcia's right of confrontation**

In his third issue, Garcia asserts that the admission of Cooper's out-of-court statements violated his right to confront her during trial. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."). The State responds that Garcia forfeited his confrontation right by encouraging the victim to not appear at trial.

---

[7] The victim's mother testified that she had observed "bruises, some swelling in her face and some bruising around her neck specifically," and that the bruising around the neck was "similar, but not quite as pronounced" as the bruising from the current assault. No further testimony describing the extent of Cooper's prior injuries was elicited by the State, and no photographs of Cooper's injuries resulting from the prior assault were admitted into evidence.

16

The United States Supreme Court has held that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004). Accordingly, the Confrontation Clause prohibits the admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had [] a prior opportunity for cross-examination." *Id*. at 53-54. The State did not dispute during trial that Cooper's statements were testimonial.

The Supreme Court has recognized two exceptions to the rule that such testimonial statements are to be excluded. The exception applicable here is the doctrine of "forfeiture by wrongdoing," which "extinguishes confrontation claims on essentially equitable grounds," *id*. at 62, and permits the introduction of testimonial statements of a witness who was "detained" or "kept away" from trial by the "means or procurement" of the defendant.[8] *Giles v. California*, 554 U.S. 353, 359 (2008). "The doctrine is based on the principle that 'any tampering with a witness should once for all estop the tamperer from making any objection based on the results of his own chicanery.'" *Gonzalez v. State*, 195 S.W.3d 114, 117 (Tex. Crim. App. 2006) (quoting *Reynolds v. United States*, 98 U.S. 145, 158-59 (1879)).

For the doctrine to apply, the declarant's unavailability must be the result of the defendant's act of misconduct. *Id*. at 120. Additionally, the Supreme Court has held that the defendant must have engaged in the misconduct with the specific intent to prevent the witness from

---

[8] The other recognized exception is the dying declaration, "made by a speaker who was both on the brink of death and aware that he was dying." *Giles v. California*, 554 U.S. 353, 359 (2008).

testifying. *Giles*, 554 U.S. at 359-60. The Supreme Court has also explained that the forfeiture doctrine has particular relevance in the context of domestic-violence cases:

> Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in [a criminal offense such as] murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.

*Id*. at 377; *see also id*. at 380 (Souter, J., concurring) ("[T]he element of intention would normally be satisfied by the intent inferred on the part of the domestic abuser in the classic abusive relationship, which is meant to isolate the victim from outside help, including the aid of law enforcement and the judicial process.").

During trial, when the State raised the issue of forfeiture in response to Garcia's confrontation objection, the district court held a hearing outside the presence of the jury and considered evidence presented by both Garcia and the State. Ultimately, the district court ruled in favor of the State and entered written findings of fact and conclusions of law to that effect. Among the district court's findings were the following:

- The Defendant intimidated and dissuaded the victim from resorting to outside help before and during the crime.

- The Defendant dissuaded the victim from participating in the criminal prosecution of this case.

- On March 1, 2011, the Defendant wrote Ms. Cooper and told her to get his charge dropped to a misdemeanor.

18

- The Defendant continued to write Ms. Cooper and call her to re-establish their relationship.

- The Defendant told Ms. Cooper that she could hurt him while talking about the case.

- The Defendant pressured Ms. Cooper not to testify by saying, "I need to know where you stand; you don't need to go at all."

- On Saturday before trial, the Defendant scolded Ms. Cooper for getting served for this trial setting, saying she should not have gotten served and saying that she was a whole lot easier to find than most people. He claimed that she tried not to avoid service. Ms. Cooper was crying and apologizing for messing up.

- The Defendant told Ms. Cooper to stop visiting him at the jail because she needed to lay low.

Based on its findings, the district court concluded that "the acts of the Defendant show that he intended to keep the witness from testifying. As a result, Defendant forfeited his confrontation claims."

Although we defer to the trial court's determination of historical facts and witness credibility, we review de novo the legal question of whether the admission of evidence violates the Confrontation Clause. *See Wall v. State*, 184 S.W.3d 730, 742-43 & n.44 (Tex. Crim. App. 2006); *Render v. State*, 347 S.W.3d 905, 917 (Tex. App.—Eastland 2011, pet. ref'd); *Davis v. State*, 268 S.W.3d 683, 704 (Tex. App.—Fort Worth 2008, pet. ref'd). Here, the question presented is whether the evidence in the record, and any reasonable inferences to be drawn therefrom, supports the district court's findings that Cooper's unavailability was the result of Garcia's misconduct and that Garcia committed the misconduct specifically for the purpose of preventing Cooper from testifying. *See Gonzalez*, 195 S.W.3d at 125-26.

19

Although, as the State conceded during trial, there was no evidence that Garcia made a direct threat to Cooper not to testify, there was evidence tending to show that Garcia, through his misconduct, encouraged and persuaded Cooper to violate the subpoena and not appear in court to testify. In a letter written to Cooper in March 2011, approximately two months before his trial was scheduled to begin, Garcia discussed the charges pending against him:

> I've done my part. Now all that's left is for you to do yours. You make sure you do everything through my lawyer and not through your lawyer or the D.A. She will advise you on everything. So once again do everything through my lawyer ([name of defense counsel], my criminal lawyer). F**k what your lawyer or the D.A. has to say. If they try and threaten you with anything. You run to and talk about it with my lawyer. You know what to do you did it last time. I would like to try and get this charge reduced to a misdemeanor, that's my goal, but if we can't, we'll have to do the best with what there is. Well there ain't much else to say about all this. We've pretty much cover[ed] everything over the phone.

Also admitted into evidence were numerous recordings of jailhouse phone calls and visits between Garcia and Cooper which, the district court could have reasonably found, shed light on the meaning of Garcia's statements in the letter and also provided additional evidence of Garcia's intent to prevent Cooper from testifying.[9] In the recordings, Cooper can be heard telling Garcia that she had been served with a subpoena to testify in Garcia's trial. Shortly thereafter,

---

[9] Garcia asserts that the record is "devoid of any evidence that these recordings were even reviewed" by the trial court in making its ruling. However, the record reflects that the recordings were admitted into evidence for purposes of the hearing, and the district court's findings of fact specifically reference certain statements made by Garcia in the recordings. Garcia further complains on appeal that the voices in the recordings were never authenticated. Although Garcia objected to the authenticity of the recordings at the time they were offered, he failed to obtain a ruling on this objection prior to the evidence being admitted. *See* Tex. R. App. P. 33.1. At any rate, the record supports an implied finding by the district court that the voices on the recording were those of Garcia and Cooper, as the voices referred to each other by name and additional identifying characteristics on multiple occasions.

Cooper tells Garcia, "I'll figure it out." At some point during the conversation, Garcia tells Cooper, "Do whatever you have to do" and warns her not to trust the prosecutors because they will "twist your words." In another conversation, Garcia tells Cooper that she makes "bad decisions" and emphasizes to her that "what you do can affect my life." In later conversations, while discussing his upcoming trial, Garcia tells Cooper, "I just need to know where you stand; you don't need to go at all" and informs her that he is "pretty anxious about the trial." He also tells Cooper that their life together will be different based on whether he "gets out soon" or "gets out later." In their final conversation the weekend before trial, Garcia asks Cooper about her thoughts regarding the prosecutors. Cooper tells Garcia, "They're out to screw us," and, "I'm trying to shield you from . . . these people." Cooper then begins crying. Garcia responds by telling Cooper that she needs to think about her "decisions" and that the "main mistake" she makes is "trusting people." Garcia also tells Cooper, in an apparent reference to law enforcement officials, that "they find you a lot easier" than they find other people and that Cooper should "try to avoid them." Garcia adds, "You need to lay low," and instructs her, "This needs to stop. You need to worry about you."

Other evidence considered by the district court included the testimony of Cooper's mother, who explained that Garcia had assaulted her daughter in the past, and Roya Williamson, the Crime Victims' Services coordinator for the San Marcos Police Department. Williamson testified that she had assisted Cooper in relocating after Cooper had reported the latest assault. According to Williamson, in order to qualify for assistance in relocating, the victim of an assault must demonstrate that she is fearful of having further contact with her assailant. Williamson testified that Cooper qualified for such assistance, and she also explained that in her opinion, Cooper was afraid of being located by her assailant. The district court also heard brief testimony from Cooper's lawyer,

21

who testified on behalf of Garcia. According to Cooper's lawyer, he was authorized by Cooper to represent to the court "that she did not wish to testify" but that "[i]t was not a result of threat or fear or coercion on the part of the accused, Roy, that there were other reasons."[10]

Viewing the evidence and all reasonable inferences therefrom in the light most favorable to the district court's ruling, the record supports the district court's findings that Cooper did not testify as a result of Garcia's misconduct, and that Garcia intended to prevent Cooper from testifying. Although Cooper's lawyer claimed otherwise, the district court was free to disbelieve the representation that Cooper had made to her lawyer and instead credit the other evidence in the record tending to show that Garcia had engaged in a pattern of misconduct prior to trial that was intended to prevent Cooper from testifying and making use of the judicial process. This evidence included the testimony of witnesses with knowledge of the relationship between Cooper and Garcia, letters and other documentary evidence which tended to demonstrate the abusive and ongoing nature of that relationship, and audio recordings in which Garcia both explicitly and implicitly discouraged Cooper from trusting the prosecutors and appearing at trial. We cannot conclude on this record that the district court abused its discretion in admitting Cooper's out-of-court statements based on its conclusion that Garcia forfeited by wrongdoing his rights under the Confrontation Clause. *See Gonzalez*, 195 S.W.3d at 125; *Sohail v. State*, 264 S.W.3d 251, 259-60 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd); *see also Pena v. State*, No. 03-08-00546-CR, 2009 Tex. App. LEXIS

---

[10] Cooper's lawyer did not specify what those "other reasons" were, although Garcia's counsel argued during trial that Cooper was afraid of the prosecutors and also fearful that if she testified, she would lose her children. We note that such reasons, the district court could have reasonably inferred, were actually consistent with the State's theory that Garcia had discouraged Cooper from testifying by telling her not to trust the prosecutors and warning her of possible consequences if she testified.

22

7150, at *15-18 (Tex. App.—Austin Sept. 9, 2009, no pet.) (upholding trial court's finding of forfeiture by wrongdoing on similar record).  We overrule Garcia's third issue.

**Hearsay issues**

In his fourth issue, Garcia asserts that the district court abused its discretion in admitting Cooper's statements to Officer Slaughter under the "excited utterance" exception to the hearsay rule.[11]  In his fifth issue, Garcia similarly asserts that the district court abused its discretion in admitting Cooper's statements to Dr. Berro under the "medical treatment and diagnosis" exception to the hearsay rule.[12]  Again, we review the district court's decision to admit

---

[11]  In this issue, Garcia also complains briefly (without elaboration or citation to authority) of the admission of statements allegedly made by Garcia to Cooper during the assault.  It is well established that out-of-court statements allegedly made by a criminal defendant are admissible as admissions by party opponents, without the need for any additional showing of reliability.  *See* Tex. R. Evid. 801(e)(2)(A); *Trevino v. State*, 991 S.W.2d 849, 853 (Tex. Crim. App. 1999).  Such statements "are admissible on the logic that a party is estopped from challenging the fundamental reliability or trustworthiness of his own statements."  *Trevino*, 991 S.W.2d at 853.  Thus, to the extent that this issue has been raised in Garcia's brief, we cannot conclude that the district court abused its discretion in admitting any hearsay statements allegedly made by Garcia.

[12]  In its brief, the State's only response to both hearsay issues is that they are "moot" because, in the State's view, by forfeiting his confrontation rights, Garcia also forfeited his right to object to the admission of evidence on hearsay grounds.  As support for this view, the State cites to *Gonzalez v. State*, 195 S.W.3d 114 (Tex. Crim. App. 2006).  However, in *Gonzalez*, the court of criminal appeals was merely discussing in dicta the "forfeiture by wrongdoing" exception to the hearsay rule codified in the Federal Rules of Evidence.  *See id*. at 119 (citing Fed. R. Evid. 804(b)(6)).  No similar exception currently exists in the Texas Rules of Evidence.  *See* Tex. R. Evid. 801-804; *see also Crawford v. Washington*, 541 U.S. 36, 50-51 (2004) (explaining that whether statement violates Confrontation Clause is separate inquiry from whether same statement violates rules of evidence); *Woods v. State*, No. 08-07-00203-CR, 2009 Tex. App. LEXIS 8749, at *14 (Tex. App.—El Paso Nov. 12, 2009, pet. denied) ("The State's reliance on *Gonzalez* is misplaced because it does not stand for the proposition that the forfeiture-by-wrongdoing doctrine is an exception to the hearsay rule.  It applies to an objection based on a confrontation clause violation.").  We also note that in this case, the district court specifically required the State to demonstrate not only that the victim's statements were admissible under the Confrontation Clause, but also that they were separately admissible under a recognized exception to the hearsay rule.

23

evidence for abuse of discretion and will not find an abuse of discretion unless the district court's decision "is so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *See Montgomery*, 810 S.W.2d at 391.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d). Hearsay statements are inadmissible unless they fall within a recognized exception to the hearsay rule. Tex. R. Evid. 802. We first address the admissibility of statements made by Cooper to Officer Slaughter admitted under the "excited utterance" exception to the hearsay rule. An "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tex. R. Evid. 803(2).

"The basis for the excited utterance exception is 'a psychological one, namely, the fact that when a man is in the instant grip of violent emotion, excitement or pain, he ordinarily loses the capacity for reflection necessary to the fabrication of a falsehood and the truth will come out.'" *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003) (quoting *Evans v. State*, 480 S.W.2d 387, 389 (Tex. Crim. App. 1972)). Factors that the trial court may consider in determining whether a hearsay statement is admissible as an excited utterance include "the length of time between the occurrence and the statement, the nature of the declarant, whether the statement is made in response to a question, and whether the statement is self-serving." *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005). However, "these are simply factors to consider" and are not dispositive. *Zuliani*, 97 S.W.3d at 596. "The critical determination is 'whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event' or condition at the time of the statement." *Id*. (quoting *McFarland v. State*, 845 S.W.2d 824, 846 (Tex. Crim. App. 1992)). Additionally, the

declarant does not actually have to be "excited" as that term is commonly understood. "The critical question . . . is not the specific type of emotion that the declarant is dominated by—anger, fear, happiness—but whether the declarant was still dominated by the emotion caused by the startling event when she spoke." *Coble v. State*, 330 S.W.3d 253, 294 (Tex. Crim. App. 2010). It is also important to distinguish between an excited utterance and a different hearsay exception, the "present sense impression," which is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Tex. R. Evid. 803(1). "[T]he excited-utterance exception is broader than the present-sense-impression exception." *McCarty v. State*, 257 S.W.3d 238, 240 (Tex. Crim. App. 2008). "[U]nder the excited-utterance exception, the startling event may trigger a spontaneous statement that relates to a much earlier incident." *Id*.

In this case, Cooper's mother, Christina, testified that on the night of June 6, 2010 (which was approximately 24 hours after the assault had allegedly occurred), she received a call from her daughter asking her to come and pick her up at a grocery store. According to Christina, Cooper sounded "terrified" and "hysterical." Christina added, "She was having a hard time communicating what she was wanting to communicate, speaking quickly. Her voice was shaky and she was crying." Shortly after meeting Cooper at the store, Christina took her daughter to the emergency room at a local hospital. Once there, she was seen and treated by Dr. Berro, who testified that Cooper complained "of pain all over" her body and was "very upset, tearful and anxious." Berro agreed with the prosecutor's statement that Cooper "was definitely under the stress of the event that had happened to her." Berro then called the police to report what Cooper had told him. Officer Slaughter responded to the call, and he described Cooper as being "fearful," "very scared,"

"very timid and shy" and "very afraid, embarrassed." He also testified that Cooper "would not make eye contact" with him, seemed "somewhat reluctant" to talk to him, and appeared to be in pain "everywhere." According to Slaughter, when he started to ask Cooper what had happened to her, "she began to cry" "to the point where she had tears running down her face and . . . she was not able to speak where [Slaughter] could understand her." He added, "[S]he had to stop and catch her breath . . . to be able to talk before I could understand what she was saying." Slaughter further testified that Cooper appeared "somewhat excited" but "more scared than excited." He also agreed with the prosecutor's statements that Cooper "was having difficulty controlling her emotions about the event" and "was still under the stress of the incident when she was talking" to Slaughter.

Although the statements were made approximately 24 hours after the assault allegedly occurred, and apparently were in response to questioning by Slaughter, the above evidence supports a finding by the district court that Cooper was still dominated by the emotions, excitement, fear, or pain of the assault at the time she made her statements. The officer, Cooper's mother, and Cooper's treating physician each provided testimony detailing their observations of Cooper's demeanor and behavior. From this and other evidence, the district court could reasonably infer that Cooper was still dominated by the pain of and the emotions related to the assault to such a degree that her statements were not the result of reflective thought but were instead spontaneous descriptions of what had happened to her. On this record, it would not be outside the zone of reasonable disagreement for the district court to conclude that Cooper's statements to Slaughter were excited utterances. *See Coble*, 330 S.W.3d at 294-95; *McCarty*, 257 S.W.3d at 239-40; *Apolinar*, 155 S.W.3d at 190-91; *Zuliani*, 97 S.W.3d at 596. Accordingly, we cannot conclude that the

26

district court abused its discretion in admitting Cooper's statements to Slaughter. We overrule Garcia's fourth issue.

We next address the admissibility of statements made by Cooper to Dr. Berro under the "medical diagnosis or treatment" exception to the hearsay rule. This exception allows for the admission of hearsay statements "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Tex. R. Evid. 803(4). For a statement to be admissible under this exception, the declarant must make the statement for the purpose of receiving medical diagnosis or treatment and the statement made must be "pertinent" to the medical diagnosis or treatment, i.e., that it is reasonable for one to rely on the information contained in the statement to diagnose or treat the individual. *See Taylor v. State*, 268 S.W.3d 571, 588-89, 591 (Tex. Crim. App. 2008); *Barnes v. State*, 165 S.W.3d 75, 82 (Tex. App.—Austin 2005, no pet.).

Here, Dr. Berro testified that in order to treat a patient who comes into the emergency room, he needs to go through "a full history and physical exam" of the patient and "find[] out all the events that preceded and may have caused their illness or ailment and the details of their ailment." When asked why it was important to "find out all that," Berro testified, "So I can figure out what's wrong with them." When asked if there was a "special procedure for handling victims of assaults at the ER," Berro testified, "We have a duty to inform the police and make sure the patient is safe as well, make sure they have a safe environment to go home to at the end of the day." To that end, Berro testified, in cases in which "there's any chance that . . . when the patient leaves the emergency department that they could be going back to an environment where that injury may occur again," it

27

is helpful to know who caused the assault and how the assault occurred. According to Berro, this was information that he considered as part of his treatment plan for victims of assault. Berro then went on to testify about his treatment of Cooper and how her chief complaint was "physical abuse and assault." Berro testified that when he was talking to her about what had happened, he "was trying to find out exactly what had happened to her, what caused her injuries, what injuries she might have." When Cooper told him what had happened, Berro explained, this gave him an idea of the injuries he needed to be looking for during his subsequent examination.

The above evidence supports findings by the district court that Cooper's statements to Dr. Berro were made for the purpose of receiving medical diagnosis or treatment and that the statements were pertinent to Cooper's medical diagnosis or treatment. Cooper was at the emergency room complaining of "physical abuse and assault." Berro testified that in order to treat victims of assault in cases in which the victim might return to her assailant, he needs to know who caused the assault and how the assault occurred. Additionally, Berro testified that Cooper complained of pain in specific areas of her body, and the district court could have reasonably inferred that in order for Berro to determine how to treat the pain in those areas, he needed to know what, specifically, had caused the pain. The district court also could have reasonably inferred that in order for Berro to know, as part of his treatment plan, whether he needed to call the police, he needed to know who exactly the assailant was and the nature and extent of the assailant's relationship with the patient. On this record, it would not be outside the zone of reasonable disagreement for the district court to conclude that Cooper's statements to Dr. Berro were statements for purposes of medical diagnosis

or treatment.[13]  Accordingly, we cannot conclude that the district court abused its discretion in admitting Cooper's statements to Berro.  We overrule Garcia's fifth issue.

## CONCLUSION

We affirm the judgments of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed:   August 29, 2012

Do Not Publish

---

[13]  Alternatively, the record would also support a finding by the district court that Cooper's statements to Dr. Berro were excited utterances under rule 803(2) for the same reasons that her statements to Slaughter were excited utterances.  As Berro testified, Cooper was "very upset, tearful and anxious" when he treated her and was complaining "of pain all over" her body.  This testimony, combined with the testimony of Cooper's mother and Officer Slaughter, would support a finding that Cooper was still dominated by the pain and emotions of the assault at the time she was treated by Berro.  *See Ramos v. State*, 245 S.W.3d 410, 417-18 (Tex. Crim. App. 2008) (trial court's ruling admitting or excluding evidence "will be upheld if it is reasonably supported by the record and is correct under any theory of law applicable to the case").